# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

RF TECHNOLOGIES CORPORATION,
RF TECHNOLOGIES, LLC, and THE
FERRITE COMPANY, INC.,

                Plaintiffs

    v.                                            Civil No. 05-32-P-C

APPLIED MICROWAVE
TECHNOLOGIES, INC., TIMOTHY
SCHEURS, and WILLIAM NURRE,

                Defendants

Gene Carter, Senior District Judge

**MEMORANDUM AND ORDER DENYING PLAINTIFFS' APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

        This case arises out of alleged misappropriation of Plaintiff The Ferrite Company,

Inc.'s (hereinafter "Ferrite") trade secrets by Defendants Applied Microwave

Technologies, Inc. (hereinafter "AMTek") and two AMTek employees -- Timothy

Scheurs and William Nurre.[1]  Plaintiffs' Amended Complaint alleges conversion (Count

I), breach of contract (Count II), misappropriation of trade secrets in violation of 10

M.R.S.A. § 1541 *et seq*. (Count III), and unfair competition (Count IV).  In Count V,

---

[1] Plaintiffs' Amended Complaint also asserts claims against AMTek employees Tom Allison,
Terry LeClere, and Montylee Watt.  The claims against these three individual Defendants were dismissed
for lack of personal jurisdiction.  *See* Memorandum and Order Granting in Part and Denying in Part
Defendants' Motion to Dismiss (Docket Item No. 53).

Plaintiffs seek a declaratory judgment that they are not required to perform under the terms of a purchase order placed by AMTek.

Now before the Court is Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction (Docket Item No. 6).  For the reasons set forth below, the Court will deny Plaintiffs' Motion.

## I.        Factual Background

The facts giving rise to this case are laid out in greater detail in this Court's Memorandum and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (Docket Item No. 53).  For purposes of the present motion, the following facts are necessary as background.

In early 2003, Ferrite purchased the assets of the Amana Industrial Microwave Division (hereinafter "Amana") -- owned at the time by the Maytag Corporation -- for $2,800,000 plus royalties on sales.  Amended Complaint ¶ 12.  Following this sale, former Amana employees, including the two individually named Plaintiffs, formed AMTek under the laws of Iowa.  *Id.* ¶ 17.  Plaintiffs allege that at the time the former Amana employees left Maytag's employ, they copied and took with them confidential and proprietary drawings of Amana industrial microwave ovens -- the drawings Ferrite had purchased from Maytag -- for the purpose of building their own competitive microwave ovens.  *Id.* ¶ 16.  Plaintiffs allege that these actions were in violation of confidentiality agreements that the individual Defendants signed with Maytag.  *Id.* at 5.[2]

Plaintiffs' belief that AMTek was using Amana drawings developed when Plaintiff RF Technologies, LLC (hereinafter "RFT, LLC"), a wholly owned subsidiary of

---

[2] These Maytag confidentiality agreements were assigned to Ferrite as part of the Amana sale. Amended Complaint ¶ 15.

Ferrite, entered into negotiations to purchase Plaintiff RF Technologies Corporation (hereinafter "RFT Corp."). In the course of negotiations between RFT Corp. and RFT, LLC, RFT Corp. disclosed to Ferrite that RFT Corp. was manufacturing certain products for AMTek based upon drawings provided by AMTek. *Id.* In January 2005, Ferrite saw the AMTek drawings submitted to RFT Corp. *Id.* These drawings were prepared by Defendant Nurre, who had signed a confidentiality agreement with Maytag. *Id.* Plaintiffs contend that the AMTek drawings are thinly disguised copies of the confidential and proprietary Amana drawings of microwave components that Maytag had loaned to RFT Corp. for component production. *Id.* ¶ 20. Plaintiffs' allegations against AMTek center around four microwave components: the rotary feed, the water load cylinder, the water load box, and the launcher weldment.

In support of their Application for Temporary Restraining Order and Preliminary Injunction, Plaintiffs have filed, *inter alia*, an Affidavit of Richard G. Wolfe, President and Chief Executive Officer of Ferrite and Manager of RFT, LLC (Docket Item No. 7); an Affidavit of Paul M.C. Alton, Component Development Manager of Ferrite (Docket Item No. 8); and an Affidavit of Gene Eves, Vice President of Research and Development at Ferrite (Docket Item No. 44). Read together, these affidavits outline Plaintiffs' allegation that AMTek and its employees have misappropriated Ferrite trade secrets. Moreover, Plaintiffs have submitted documents under seal to the Court that they suggest show similarities between confidential and proprietary Amana drawings -- subsequently assigned to Ferrite -- and those drawings used by AMTek for the production of its competitive microwaves.

Defendants deny taking confidential Amana property upon termination of their employ.  Instead, Defendants contend that they built their competitive industrial microwave ovens from the ground up, through research, development, and reverse engineering.  In support of this position, Defendants submitted an Affidavit of William Nurre (Docket Item No. 35), a draftsman who created drawings for both Amana and AMTek, in which he outlines the processes utilized for developing the four component parts at issue in this case.  Defendants also submitted an Affidavit of Timothy Scheurs (Docket Item No. 36), a former Amana employee who is currently employed in sales and marketing at AMTek.  Scheurs states that the rotary feed weldment drawing, the primary drawing referred to in this lawsuit, is not used in the AMTek oven, but instead is used when AMTek repairs an existing Amana oven.  *Id.* ¶ 31, 33.  Scheurs states that AMTek made improvements to the existing Amana rotary feed design through utilization of reverse engineering.  *Id.* ¶ 36.  Moreover, Scheurs asserts that Peter Robicheau, Vice President of Engineering of Plaintiff RFT Corp., was an active participant in the improvement design process.  *Id.*

With respect to the launching section, waterload cylinder, and waterload box, Defendants claim that the dimensions of these pieces are not proprietary and that the pieces are indeed stocked by numerous suppliers.  *Id.* ¶ 48.  Defendants argue that the dimensions of these components are dictated by published mathematical formulas -- not proprietary information.  *Id.* ¶ 51.  Furthermore, Defendants contend that Plaintiff RFT Corp. not only knew about AMTek's competitive ovens and components, but was also an active participant in the design process.

In support of their argument that the waterload cylinder is not copied from proprietary Amana drawings, Defendants have submitted e-mails received from RFT Corp. delineating the differences between AMTek and Amana components.  One particular e-mail states the following: "I just received the water cylinder this morning and will need to pull my offer.  The materials and fittings are quite different from the past units and delivery for all brass and quantity of one is not realistic."[3]  E-mail from Peter Robicheau, Vice President of Manufacturing, RF Technologies, Corp., to William Nurre, Draftsman, Applied Microwave Technologies, Inc. (Apr. 12, 2004) (attached as Exhibit 7 to Affidavit of William Nurre (Docket Item No. 35)) (emphasis added).  Mr. Robicheau also provided guidance to Mr. Nurre for construction of the water load box.  *See* E-mail from Peter Robicheau, Vice President of Manufacturing, RF Technologies, Corp., to Bill Nurre, Draftsman, Applied Microwave Technologies, Inc. (Apr. 20, 2004) (attached as Exhibit 10 to Affidavit of William Nurre).  Mr. Nurre further states that Mr. Robicheau was an active participant in the design of the launcher weldment, *see* Affidavit of William Nurre ¶ 62, and the rotary feed.  *Id.* ¶ 50.[4]

---

[3] Defendants contend that "past units" refers to Amana waterload cylinders.

[4] Defendants have also provided the Court with an email written by Mr. Robicheau regarding design of the AMTek Shunt "T".  Although this component is not at issue in the present litigation, the advice provided by Mr. Robicheau supports Defendants' position that Plaintiff RFT Corp. was an active participant in AMTek's design of new parts.  Specifically, Mr. Robicheau stated as follows:

> In order for RFT to advise Amtek on the location and dimension for a tuning stub, we will have to set up the first piece of each configuration in test then advise the data.  I would in that case have to charge you a one time test fee for each part.  I would expect that to be app. One hour max each at $65.00/hr.  After the first we repeat per the info on your drawings.  Another benefit will be the paper trail demonstrating to the outside world [that] Amtek did in fact pay for technical info and did not steal it from Amana.

E-mail from Peter Robicheau, Vice President of Manufacturing, RF Technologies, Corp., to Bill Nurre, Draftsman, Applied Microwave Technologies, Inc. (May 19, 2004) (attached as Exhibit 12 to Affidavit of William Nurre).

## II.     Legal Standard

The Court begins by noting that "it is well established general law with respect to equitable injunctive relief that the Court is to bear constantly in mind that an 'injunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case.'"  *Signet Elec. Sys., Inc. v. Taylor*, No. 03-280-P-C, 2003 WL 22948035, at *2 (D. Me. Dec. 9, 2003) (quoting *Plain Dealer Publ'g Co. v. Cleveland Typographical Union No. 53*, 520 F.2d 1220, 1230 (6th Cir. 1975)).  In considering a motion for a preliminary injunction, the Court must consider four elements: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, *i.e.*, the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). In applying this standard, "trial courts have wide discretion in making judgments regarding the appropriateness *vel non* of preliminary injunctive relief." *Charlesbank Equity Fund II*, 370 F.3d at 162.

The first factor -- whether the Plaintiff establishes a likelihood of success on the merits -- is considered the most significant of the four factors.  *See Rencor Controls, Inc. v. Stinson*, 230 F. Supp. 2d 99, 102 (D. Me. 2002); *Am. Soc'y of Consultant Pharmacists v. Concannon*, 214 F. Supp. 2d 23, 26 (D. Me. 2002).  Thus, the likelihood of success is "[t]he *sine qua non* of this four-part inquiry" with the remaining factors becoming only "matters of idle curiosity" if Plaintiffs cannot demonstrate that they are likely to prevail

6

with their claim.  *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st

Cir. 2002).

### III.    Plaintiffs' Claim Under the Maine Uniform Trade Secrets Act

The Maine Law Court has stated that "a court examining a claim under the UTSA

[Uniform Trade Secret Act] must determine whether the information at issue constitutes a

'trade secret,' as that term is defined in 10 M.R.S.A. § 1542(4)."  *Spottiswoode v. Levine*,

730 A.2d 166, 174 (Me. 1999).  To constitute a trade secret, the information must (1)

derive "independent economic value, actual or potential, from not being generally known

to and not being readily ascertainable by proper means by other persons who can obtain

economic value from its disclosure or use;" and (2) "[i]s the subject of efforts that are

reasonable under the circumstances to maintain its secrecy."  10 M.R.S.A. § 1542(4).[5]

Reverse engineering is a proper means to discover information provided that "the

acquisition of the known product must, of course, also be by a fair and honest means,

such as purchase of the item on the open market."  *Bernier v. Merrill Air Eng'rs*, 770

A.2d 97, 108 (Me. 2001).  Defendants contend that they reverse engineered the rotary

feed after purchasing two rotary feeds from Plaintiff RFT Corp.  Affidavit of William

Nurre ¶ 40(B).  Defendants state that they derived measurements for the water load

cylinder and the water load box from an oven purchased from Star Tobacco.  *Id.* ¶¶ 51,

56.  Defendants further assert that they designed the launcher weldment by using

---

[5] Defendants contend that Iowa substantive law governs this dispute.  *See* Defendants' Objections to Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction (Docket Item No. 32), at 14 n.16.  The Court notes that Iowa trade secret law is also based upon the Uniform Trade Secrets Act and contains the same definition of a trade secret as Maine.  *See* Iowa Code § 550.2(4).  The Court need not resolve any choice of law issue if "the outcome is the same under the substantive law of either jurisdiction."  *Lambert v. Kysar*, 983 F.2d 1110, 1114 (1st Cir. 1993); *see also Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004) ("[t]he first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions ….").  No apparent conflict exists here.

drawings provided by California Tube Laboratory, Inc. for dimensional support. *Id.* ¶ 58. Plaintiffs do not dispute that Defendants obtained any of these items by fair means.

Plaintiffs' contention that Defendants stole proprietary information about design dimensions and tolerances is also undercut by the availability of such information in the public domain.  Defendants have provided the Court with copies of engineering textbooks and guides referencing the very information Plaintiffs claim is proprietary. Though Plaintiffs appear to concede that such information is indeed public, they insist that the compilation of such material constitutes a trade secret. *See* Plaintiffs' Reply in Support of Application for Temporary Restraining Order (Docket Item No. 42), at 3. Plaintiffs ask the Court to view this compilation of materials as parallel to a compilation of customer names and telephone numbers, which some courts have held to constitute trade secrets.  Plaintiffs have provided no evidence, however, that trained microwave engineers would not be aware of these sources or be able to find this information. Without such evidence, the Court is unable to conclude on the existing record that AMTek engineers would not have been aware of this public information save for employment with Amana.

Plaintiffs also suggest that Defendant Nurre utilized an Amana trade secret in his development of the rotary feed.  Mr. Nurre admits that "after I had reverse engineered the rotary feed … I referred to an assembly drawing which I had used when I was an employee of Amana."  Affidavit of William Nurre ¶ 22.  Plaintiffs contend that this admission conclusively establishes that Defendants utilized confidential and proprietary information.

Though Plaintiffs suggest otherwise, the current record contains credible support that assembly drawings are distinguishable from manufacturing drawings insofar as they lack necessary information from which one could build a rotary feed.  Furthermore, the record suggests that it is industry practice to freely distribute assembly drawings, and Amana/Ferrite did in fact widely distribute these drawings.  *See* Affidavit of Richard H. Edgar (Docket Item No. 39) ¶¶ 23, 25-27.  In such a circumstance, assembly drawings cannot be classified as trade secrets.  *See, e.g.*, *Lansing Overhaul & Repair, Inc. v. Fross Indus.*, No. CIV-86-867E, 1988 WL 12582, at *3 (W.D.N.Y. Feb. 19, 1988).  Though Plaintiffs contend the assembly drawings are in fact trade secrets in the present case, they have not sufficiently supported this assertion.

On the existing record, Plaintiffs have not established that their alleged confidential and proprietary information is "not … generally known to and not … readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use."  10 M.R.S.A. § 1542(4).[6]  Accordingly, the Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits that warrants issuance of a preliminary injunction or temporary restraining order with respect to their claim under the Maine Uniform Trade Secrets Act.  Plaintiffs having failed to demonstrate a likelihood of success on the merits, the Court need not consider the other factors for issuing injunctive relief.[7]

---

[6] Because Plaintiffs have not established, on the existing record, that the components at issue in this case constitute trade secrets, the statements and allegations contained in the Affidavit of Paul M.C. Alton do not independently suffice to support the issuance of a temporary restraining order or preliminary injunction.

[7] From Plaintiffs' Complaint and Application for Temporary Restraining Order and Preliminary Injunction, it appears that the conversion and breach of contract claims arise out of the same alleged taking of proprietary and confidential information contained in the claim under the Maine Uniform Trade Secrets Act.  Because Plaintiffs have not established a likelihood of success on their claim that Defendants used an

#### IV.      The Unfair Competition Claim

Plaintiffs contend that as a result of Defendants' misappropriation of proprietary information, Defendants were able to underbid Ferrite on an order from a former Amana customer, thus unfairly depriving Ferrite of a two million dollar sale.  *See* Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction, at 6; Affidavit of Richard G. Wolfe ¶ 24.  Under the four part inquiry relevant to preliminary injunctive relief, Plaintiffs have the burden of proving that irreparable harm would result from a denial of injunctive relief.  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996).[8]  As this Court has previously stated, "where economic damages are the injury relied upon, it is to be remembered that economic harm, in and of itself, is not sufficient to constitute irreparable injury."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 70 (D. Me. 1993).  *See also McDonough v. Trustees of Univ. Sys. of New Hampshire*, 704 F.2d 780, 784 n.2 (1st Cir. 1983).  The Court is satisfied that should Plaintiffs prevail on the unfair competition claim, economic damages will be the appropriate remedy.  Accordingly, because the Court has broad discretion in evaluating whether alleged harm is irreparable in nature, *see K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989), and because the Court is of the opinion that the unfair competition claim does not give rise to irreparable injury, preliminary injunctive relief is not appropriate on the unfair competition claim.

---

Amana/Ferrite trade secret, the Court concludes that Plaintiffs also have not established a likelihood of success on the merits of their breach of contract and conversion claims.

[8] The Court also notes that Plaintiffs have failed to present any arguments suggesting success on the merits of this claim.

### V.      Conclusion

For the reasons set forth above, it is **ORDERED** that Plaintiffs' Motion for

Temporary Restraining Order and Preliminary Injunction be, and it is hereby, **DENIED**.

It is **FURTHER ORDERED** that Plaintiffs' Motion for Oral Argument (Docket Item

No. 9) be, and it is hereby, **DENIED.**

/s/Gene Carter_____

**GENE CARTER**
United States Senior District Judge

Dated at Portland, Maine this 6th day of May, 2005.